## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **BRIGHTHOUSE LIFE INSURANCE COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **VEDAH W. DABOUB, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| _____ | § | **CIVIL ACTION NO. 3:21-cv-00543** |
| **VEDAH W. DABOUB and DANIELLE D. SHERMER, as Trustee** | § | |
| | § | |
| **Cross-Plaintiffs,** | § | |
| **v.** | § | |
| | § | |
| **WELLS FARGO BANK, N.A., AS SECURITIES INTERMEDIARY and COVENTRY FIRST LLC,** | § | |
| | § | |
| **Cross-Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Judgment on the Pleadings (ECF No. 61) and the Unopposed Motion to Partially Seal Docket No. 61 (ECF No. 62), both filed by Defendant, Cross-Plaintiff, and Cross-Defendant Wells Fargo Bank, N.A., in its capacity as securities intermediary ("Wells Fargo"). Also before the Court is the Motion to Dismiss Crossclaims (ECF No. 41), filed by Cross-Defendant Coventry First, LLC, and the Motion for Leave to Amend (ECF No. 52), filed by Cross-Defendants and Cross-Plaintiffs Vedah Daboub and Danielle Shermer ("Cross-Plaintiffs").

1

The Unopposed Motion to Partially Seal Docket No. 61 is **GRANTED.**  For the reasons stated below, Cross-Plaintiffs' Motion for Leave to Amend is **DENIED**, Wells Fargo's Motion for Judgment on the Pleadings is **GRANTED**, and Coventry First's Motion to Dismiss is **GRANTED.**

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On March 9, 2021, Brighthouse Life Insurance Company, formerly known as Travelers Life and Annuity Company, filed this interpleader action against Vedah Daboub and Wells Fargo, as securities intermediary, seeking a determination regarding the assignment of ownership and the proper beneficiary of proceeds due under Term Life Insurance Policy No. 4968667 (the "Policy"), issued to and covering the life of Charles H. Daboub ("Decedent") in the amount of $500,000.00.  Interpleader Compl. (ECF No. 1) ¶¶ 8–23; *see id*. Ex. A (ECF No. 1-1) (the "Policy") at 4.[1]

Prior to his death, the Decedent was married to Defendant, Cross-Defendant, and Cross-Plaintiff Vedah Daboub.  In 2014, Decedent executed a Statutory Durable Power of Attorney, appointing Daboub and their daughter, Danielle Shermer, to act as his co-agents and attorneys-in-fact.  *See* ECF No. 37-4 ("POA") at 3.  The POA provides that the powers granted by it are "broad and sweeping," "and grants "full power and authority to do and perform all and every act and thing" as could Decedent, including a specific grant of power as to "[i]nsurance and annuity transactions."  *Id.* at 2–3, 6.  The POA further indicates Decedent's agreement that "any third party who receives a copy of [the POA] may act under it," and requires Decedent "to indemnify the third party for any claims that arise against the third party because of reliance on this power of attorney."  *Id.* at 6–7.

---

[1] Page numbers in citations to items on the docket refer to the ECF pagination at the top of the page.

Cross-Plaintiffs allege that Daboub has a history of mental illness and has used painkillers and medications throughout her life, at times becoming addicted and overmedicated. First Am. Crosscl. ¶ 12. Daboub served as Decedent's primary caregiver for several years as he suffered from various medical ailments, including Alzheimer's disease and a pulmonary embolism. *Id.* ¶¶ 13–17. In March 2020, Daboub moved with Decedent to memory care assisted living, to quarantine and care for Decedent during the pandemic. *Id.* Cross-Plaintiffs allege that Daboub's mental health declined while in isolation and that she took additional medication, painkillers, and sleep aids to manage. *Id.*

While Daboub was quarantining in isolation with Decedent, she contacted Cross-Defendant Coventry First LLC, after seeing an advertisement. *Id.* ¶ 18. Coventry First is a life settlement firm that will purchase life insurance policies for less than the full policy value but more than the policy surrender value, *i.e.*, the amount the insurance company will pay to repurchase the policy. Cross-Plaintiffs allege that, as part of a "campaign to coerce [Daboub] into selling the Policy," Daboub communicated with a Coventry First agent named "Allison" for several months, who allegedly gained Daboub's trust as a friend despite their never meeting in person. *Id.* Cross-Plaintiffs allege that, at the time, Daboub was stressed, emotional, financially troubled, and taking high doses of sleeping pills and antidepressants. *Id.* ¶ 19.

In June 2020, Decedent was placed in hospice care, and Daboub moved in with their daughter, Shermer. *Id.* ¶ 17. On October 2, 2020, Coventry First made an offer to Decedent to purchase the Policy, which expired on October 9, 2020. *Id.* ¶ 19; *id.* Ex. F (ECF No. 37-6) at 1. Cross-Plaintiffs allege that Coventry First continued to contact Daboub regarding selling the Policy after the offer expired. First Am. Crosscl. ¶ 20.

On October 13, 2020, before a notary, Daboub signed a Life Insurance Policy Purchase Agreement on behalf of Decedent as his attorney-in-fact. *Id.* ¶ 21; *Id.* Ex. G (ECF No. 37-7) at 7 ("Purchase Agreement"). The Purchase Agreement states that it has an effective date of October 20, 2020, and provides that, in exchange for the purchase price of $74,800, Decedent assigned and unconditionally transferred to Coventry "all right, title and interest in and to the Policy, free and clear of all liens, security interest, claims, charges, restrictions or encumbrances." Purchase Agreement at 1. The Purchase Agreement further states that Decedent relinquished and assigned any rights Decedent has in the Policy to Coventry First, designates Coventry First as the sole beneficiary of the Policy, and provides that Coventry First shall have the right to "change any beneficiary on the Policy." *Id.* at 1–2. The Purchase Agreement also required Decedent to "promptly deliver . . . the originals of any other fully executed forms or written authorizations necessary or desirable to effect a change in both the beneficiary designation and/or the ownership of the Policy." *Id.* at 2. As part of the Purchase Agreement, Daboub was required to execute in her personal capacity as Decedent's wife the "Spouse's Release and Consent to Change Beneficiary of Life Insurance Policy" form and "Beneficiary's Release and Consent to Change Beneficiary of Life Insurance Policy" form. *Id.* at 1. Daboub signed both agreements before a notary on October 13, 2020. ECF No. 9-2 at 2; ECF No. 9-3 at 2.

On October 15, 2020, Daboub underwent hip surgery. First Am. Crosscl. ¶ 22. On October 16, 2020, allegedly still under the effects of anesthesia and pain medication following surgery, Daboub signed Coventry First's offer letter to purchase the Policy as Decedent's attorney-in-fact. ECF No. 37-6 at 2. That same day, Daboub also executed a Life Insurance Absolute Assignment form as attorney-in-fact for Decedent, assigning the policy to Wells Fargo. Interpleader Compl. Ex. E (ECF No. 1-5) ("Assignment Form"). By letter dated October 20,

2020, Wells Fargo faxed the Assignment Form to Brighthouse, and on October 28, 2020, Brighthouse confirmed receipt of the Assignment Form, and that its records reflected Wells Fargo as both the owner and beneficiary of the Policy.  Interpleader Compl. Ex. G (ECF No. 1-7); *id.* Ex. F (ECF No. 1-6).

Coventry First's purchase of the Policy was funded by a financing entity, LST III, LLC. On October 21, 2020, the day after Coventry First signed the Purchase Agreement, LST III and Coventry First entered into a "Tripartite Entitlement Order," under which Wells Fargo served as the securities intermediary for both LST and Coventry First.  Countercl. Ex. 1 (ECF No. 50 at 2) ("Tripartite Entitlement Order").  Pursuant to that Order, subject to LST III's paying the Policy's purchase price to Decedent and an originator fee to Coventry First, Wells Fargo was instructed to hold the Policy in LST III's securities account until it received another entitlement order from LST III.  *Id.* at 1–5.

On November 4, 2020, LST III sold and assigned the Policy to Miravast ILS Credit Designated Activity Company ("Miravast") pursuant to a Master Policy Purchase Agreement between LST III and Miravast, dated June 13, 2018.  Countercl. Ex. 2 (ECF No. 50 at 7) ("MPP Agreement").  The day of the sale, LST III and Miravast executed a bill of sale covering the sale and an entitlement order.  Countercl. Exs. 3, 4 (ECF No. 50 at 32, 38).  The entitlement order provides that Wells Fargo would act as securities intermediary for both LST III and Miravast and, after the purchase price was paid, would hold the Policy in Miravast's securities account. Prior to the sale, Wells Fargo alleges that LST III provided Miravast with a redacted copy of the Purchase Agreement and the POA to establish LST III's ownership of the Policy.  Countercl. ¶¶ 80, 143.  Accordingly, Wells Fargo alleges that, after the sale's completion on November 4,

2020, it is the owner and beneficiary of the Policy on behalf of Miravast as the entitlement holder.

On October 20, 2020, the same day Coventry First signed the Purchase Agreement, Decedent tested positive for COVID-19.  Decedent died on November 11, 2020.  On December 1, 2020, Cross-Plaintiffs provided Brighthouse with notice that they were disputing the Policy's ownership reassignment on the grounds that Daboub lacked legal authority to sign the assignment of ownership.  Interpleader Compl. ¶ 20; First Am. Crosscl. ¶ 29; *id.* Ex. H (ECF No. 37-8).  Specifically, Cross-Plaintiffs allege that Coventry First induced Daboub to sell the Policy by preying on her financial struggles and taking advantage of her when she was recovering from surgery and under the influence of pain medication.  First Am. Crosscl. ¶¶ 18–29.  They maintain that Daboub did not have the capacity to understand the documents she was signing.  *Id.* ¶ 25. Daboub now claims that she has no memory of signing any documents or travelling to the notary, and admits in her pleadings that she "has no recollection or knowledge of Wells Fargo's involvement in the transaction."  *Id.* ¶ 23.  On February 8, 2021, after receiving Decedent's death certificate, Wells Fargo filed with Brighthouse a claim to the Policy's death benefit.  Interpleader Compl. ¶ 21; *id.* Ex. J (ECF No. 1-10).

Based on Daboub's and Wells Fargo's competing claims to the Policy's proceeds, Brighthouse filed the Complaint for Interpleader Relief on March 9, 2021.  Interpleader Compl. (ECF No. 1).  On April 9, 2021, Wells Fargo filed a Crossclaim against Daboub, seeking a declaratory judgment that it is entitled to the Policy's proceeds, and bringing claims of intentional and negligent misrepresentation.  Wells Fargo Crosscl. (ECF No. 9).  On July 5, 2021, Cross-Plaintiffs Daboub and Shermer filed a crossclaim against Wells Fargo and Coventry First.  ECF No. 32.  On July 19, 2021, Cross-Plaintiffs filed the First Amended Crossclaim,

seeking a declaratory judgment that Daboub lacked capacity to execute the Purchase Agreement or Assignment Form and accordingly those agreements are void, and Cross-Plaintiffs are entitled to the Policy's proceeds, and bringing claims of undue influence, fraud, violations of the Texas Deceptive Trade Practices Act, violations of the Texas Life Settlement Act/negligence per se, and for attorneys' fees.  First. Am. Crosscl. (ECF No. 37) ¶¶ 31–57.  Wells Fargo counterclaimed against Shermer in her dual capacities as Executor of Decedent's will and as Trustee of the Trusts created by the Decedent's will, seeking a declaratory judgment that it is entitled to the Policy's proceeds and indemnification, and asserting claims of intentional and negligent misrepresentation.  Countercl. (ECF No. 47) ¶¶ 154–78.

On June 2, 2021, this Court ordered Brighthouse to deposit into the registry of the Court the proceeds due under the Policy, after deducting Brighthouse's fees and costs associated with initiating this interpleader action.  ECF No. 28.  Wells Fargo now moves for judgment on the pleadings in its favor on Count 1 (declaratory judgment) in its Crossclaim, and Counts 1 (declaratory judgment) and 2 (indemnity) in its Counterclaim, and against all of Cross-Plaintiffs Daboub and Shermer's claims (Counts 1–6) in the First Amended Crossclaim.  Mot. (ECF No. 61) at 15.  Coventry First now moves under Rule 12(b)(6) to dismiss Cross-Plaintiffs' crossclaims against it, with the exception of the declaratory judgment claim.  ECF No. 41. Cross-Plaintiffs seek leave to amend their pleadings and file a Second Amended Crossclaim.[2] ECF No. 52.

---

[2]  Cross-Plaintiffs moved for leave to amend in their response to Coventry First's Motion to Dismiss Crossclaims. ECF Nos. 41 (Coventry First's Motion to Dismiss), 52 (Cross-Plaintiffs' Response and Motion for Leave to Amend).

## II.  LEGAL STANDARD

Rule 12(b)(6) authorizes dismissal for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The Court must "constru[e] all factual allegations in the light most favorable to the plaintiffs."  *Kopp v. Klein*, 722 F.3d 327, 333 (5th Cir. 2013).  The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  For a complaint to survive a Rule 12(b)(6) motion, it must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  A facially plausible complaint "must allege more than labels and conclusions, . . . factual allegations must be enough to raise a right to relief above the speculative level."  *Jabaco, Inc. v. Harrah's Operating Co., Inc*., 587 F.3d 314, 318 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).  In ruling on a Rule 12(b)(6) motion, the court is required to consider facts alleged in the pleadings and "written instruments" attached.  Fed. R. Civ. P. 10(c); *Scanlan v. Tex. A&M Univ*., 343 F.3d 533, 536 (5th Cir. 2003) (citations omitted).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp*., 565 F.3d 200, 207 (5th Cir. 2009) (internal quotation marked omitted) (quoting *Williams v. WMX Techs., Inc*., 112 F.3d 175, 177 (5th Cir. 1997)).

"A Rule 12(c) motion is subject to the same standard as a motion to dismiss under FRCP 12(b)(6)."  *Doe v. MySpace Inc*., 528 F.3d 413, 418 (5th Cir. 2008).  To survive a motion for

judgment on the pleadings, the plaintiff must include "enough facts to state a claim to relief that is plausible on its face."  *Id*. (quoting *Twombly*, 550 U.S. at 570).

## III.   ANALYSIS

The Court will first address Cross-Plaintiffs' Motion for Leave to Amend and Wells Fargo's Motion for Judgment on the Pleadings as to the declaratory judgment and indemnity claims.  The Court will then discuss Wells Fargo's and Coventry First's respective Motions as to Cross-Plaintiffs' remaining claims.[3]

### a.   Motion for Leave to Amend

Cross-Plaintiffs seek leave to amend their pleadings and file the Second Amended Crossclaim.  ECF No. 52.  The Court's Scheduling Order provides that the deadline to amend pleadings was July 19, 2021.  ECF No. 30.  On July 19, 2021, Cross-Plaintiffs filed the First Amended Crossclaim.  ECF No. 37.  Two months later, on September 2, 2021, Cross-Plaintiffs moved for leave to file the proposed Second Amended Crossclaim pursuant to Rule 15(a)(2).  ECF No. 52, at 2.

Here, the deadline to amend pleadings in the Scheduling Order has already expired.  Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after the deadline in the scheduling order has elapsed.  *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003).  Rule 16(b) provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge."  *Id.*  To determine good

---

[3] The Court notes that, in analyzing Wells Fargo's Motion for Judgment on the Pleadings and Coventry First's Motion to Dismiss, it is considering only the Parties' various pleadings and written documents attached to those pleadings, which include, *inter alia*, the Policy, the POA, the Purchase Agreement, the Assignment Form, the Tripartite Entitlement Order, and the entitlement order and bill of sale covering the sale of the Policy from LST III to Miravast. Because these documents are all attached to pleadings filed in this case, the Court may consider them without converting the Motion for Judgment on the Pleadings or the Motion to Dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

cause, courts examine "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Id.* The Court considers the factors holistically and "does not mechanically count the number of factors that favor each side." *EEOC v. Serv. Temps., Inc.*, 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009), *aff'd*, 679 F.3d 323 (5th Cir. 2012). Once a movant demonstrates "good cause to modify the scheduling order . . . the more liberal standard of Rule 15(a) appl[ies] to the district court's decision to grant or deny leave." *Id.* at 536. Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." *Id.* This liberal standard is generally met when the stricter standard in Rule 16(b) is met. *Id.*

The Court finds that Cross-Plaintiffs have failed to show good cause under Rule 16(b) to modify the amended pleading deadline set by the Court. Cross-Plaintiffs provide no explanation why the proposed amendments could not have been made prior to the expiration of the amended pleadings deadline, and make no effort to establish diligence in seeking leave to amend. Indeed, Cross-Plaintiffs address none of the Rule 16(b) factors, which alone justifies denial. *See* ECF Nos. 52, 53. Because Cross-Plaintiffs have failed to demonstrate good cause to modify the amended pleadings deadline under Rule 16(b), the Court need not apply Rule 15(a)'s standard.

Instead of addressing whether good cause exists to amend, Cross-Plaintiffs simply request leave to amend their pleadings in response to Coventry First's Motion to Dismiss. ECF No. 52 at 2. The request also appears to be in response to Wells Fargo's Motion for Judgment on the Pleadings. *See* ECF No. 53 at 26–27. However, as discussed below in context, the Court

considered the amendments in Cross-Plaintiffs' proposed Second Amended Crossclaim,[4] and has concluded that the amendments would not warrant a different outcome.  The proposed Second Amended Crossclaim is thus futile, further justifying denial of leave to amend.  *See Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985).  Accordingly, Cross-Plaintiffs' Motion for Leave is **DENIED.**

### b.  Wells Fargo's Motion for Judgment on the Pleadings – Declaratory Judgment and Indemnity Claims

Wells Fargo, as securities intermediary, moves for judgment on the pleadings on its declaratory judgment and indemnity claims, and on Cross-Plaintiffs' claim for declaratory judgment.

### i.  Declaratory Judgment Claims

Wells Fargo moves for judgment on the pleadings on the parties' respective declaratory judgment claims, arguing that it is the rightful owner of the Policy and the beneficiary of the proceeds deposited in the Court's registry.  Wells Fargo argues that under Texas law, it was entitled to rely on Decedent's POA designating Daboub as his agent and attorney-in-fact, regardless of whether she may have lacked capacity to execute the Purchase Agreement and Assignment Form due to illness or the influence of pain medication.  Wells Fargo further argues that both Wells Fargo, as securities intermediary, and Miravast are bona fide purchasers of the Policy, who took title of the Policy and its security entitlement free from Cross-Plaintiffs' adverse claim.  To that end, Wells Fargo also seeks judgment in its favor on Cross-Plaintiffs' declaratory judgment claim that Daboub lacked capacity to sell and reassign the Policy, and that the sale and reassignment of the Policy's beneficiary are void.

---

[4] The proposed changes appear to consist primarily of additional allegations regarding representations allegedly made by Coventry First and Wells Fargo, and a new conspiracy claim against both Coventry First and Wells Fargo.  *See* ECF No. 52-15.

It is undisputed that the POA designates Daboub as Decedent's agent and power of attorney, and bestows "broad and sweeping" powers, including a grant of power as to "[i]nsurance and annuity transactions" and "full power and authority to do and perform all and every act and thing" as could have Decedent.  POA at 3, 6.  Accordingly, under a plain reading of the POA, Daboub had the power to act on Decedent's behalf in entering into an insurance transaction.  The terms of the Policy provide that Decedent, as the Policy's owner, "may name a new Beneficiary during the [Decedent]'s lifetime and while this policy is in force.  Any change will be effective from the date [the owner] signed the notice of change . . . ."  Policy at 11.  The Policy further states that ownership of the Policy is transferable by assignment.  *Id*.  Accordingly, because the Policy provides that Decedent, as the Policy's owner, was entitled to transfer the Policy by assignment and rename the beneficiary, it follows that under the POA, Daboub had the power to act as Decedent in selling the Policy, assigning the Policy to a third party, or renaming the beneficiary.[5]

Wells Fargo points to various provisions of the Texas Estates Code, which it contends not only requires third parties to accept the validity of and rely on a durable power of attorney when presented with one, but also protects third parties from liability for relying in good faith on an invalid power of attorney.  Specifically, Wells Fargo points to Texas Estates Code § 751.201, which states that, unless an exception under § 751.206 applies, "a person who is presented with

---

[5] The Court notes that in their First Amended Crossclaim, Cross-Plaintiffs seek, *inter alia*, a declaratory judgment that "[Decedent's] Statutory Durable Power of Attorney did not grant Vedah [Daboub] the requisite legal authority to sell, transfer, convey, or assign the Policy on behalf of [Decedent]."  First Am. Crosscl. ¶ 33(iii).  However, elsewhere Cross-Plaintiffs appears to concede that the POA granted Daboub general authority to act as Decedent's agent and attorney-in-fact as described in the POA, and that instead the issue is whether Daboub's purported incapacity in executing the Purchase Agreement and Assignment Form voids the transaction.  *See, e.g.*, First Am. Crosscl. ¶ 14 ("Vedah [Daboub] handled Charles' finances and his treatment as his agent under a Statutory Durable Power of Attorney and Medical Power of Attorney."); Cross-Pls.' Resp. (ECF No. 71) at 11 (reciting, as an undisputed fact, that "Vedah [Daboub] and Danielle [Shermer] are the named co-agents on the Statutory Durable Power of Attorney for Charles Daboub"); *id.* at 15 ("Daboub does not claim that Vedah improperly exercised her authority. . . . Vedah's lack of capacity does not void Charles' Durable Power of Attorney or the authority conveyed thereunder.").

and asked to accept a durable power of attorney by an agent with authority to act under the power of attorney **shall** . . . accept the power of attorney."  Tex. Est. Code § 751.201 (emphasis added).  Section 751.206 recites various exceptions in which a power of attorney shall be rejected, but no party argues that any of the exceptions apply here.

Wells Fargo further points to § 751.209 of the Texas Estates Code, which provides:

(b) A person who in good faith accepts a durable power of attorney without actual knowledge that the power of attorney is void, invalid, or terminated, that the purported agent's authority is void, invalid, or terminated, or that the agent is exceeding or improperly exercising the agent's authority may rely on the power of attorney as if:

(1) the power of attorney were genuine, valid, and still in effect;

(2) the agent's authority were genuine, valid, and still in effect; and

(3) the agent had not exceeded and had properly exercised the authority.

Tex. Est. Code § 751.209.

Wells Fargo thus argues that Daboub had the authority under the POA to sell and reassign the Policy, and under § 751.201, third parties such as Coventry First and Wells Fargo were required to accept the POA.  Further, Wells Fargo argues that because it accepted the POA in good faith and lacked any actual knowledge of Daboub's purported incapacity, § 751.209 applies; accordingly, Wells Fargo maintains it was entitled to rely on the POA as valid when it served as securities intermediary for Coventry First, LST III, and Miravast in executing the various entitlement orders and crediting the Policy first to LST III's and then to Miravast's securities account.  Under Chapter 8 of the Texas Business and Commerce Code, a "securities intermediary" like Wells Fargo maintains a "securities account" for account holders, such as Coventry First, LST III, and Miravast, and will credit and debit interests in "financial assets," such as the Policy, according to entitlement orders.  *See* Tex. Bus. & Com. Code §§ 8.102(a)(7)–(9), (13), 8.501, 8.507.  Wells Fargo maintains that the Policy's reassignment and its actions as

13

securities intermediary in crediting entitlement to the Policy as a financial asset to LST III, and then Miravast, cannot be rescinded based on Daboub's alleged incapacity, and seeks a judgment that Wells Fargo is both the owner and beneficiary of the Policy.

The Court agrees.  The POA granted Daboub the ability to act as Decedent could have, including in selling and reassigning the Policy according to its terms.  Cross-Plaintiffs' First Amended Crossclaim contains no allegations that Wells Fargo had any direct involvement with Daboub or actual knowledge that Daboub's authority under the POA may have been void, invalid, or terminated; instead, the allegations are solely that Daboub dealt with Coventry First and its sales agent.  *See* First Am. Crosscl. ¶¶ 16–23; *id.* ¶ 23 (alleging that Daboub "has no recollection or knowledge of Wells Fargo's involvement in the transaction").  At most, three days after signing the Purchase Agreement on behalf of Decedent and executing spousal and beneficiary consent forms on her own behalf, Daboub executed the Assignment Form assigning the Policy to Wells Fargo, but there are no allegations that Daboub ever interacted with or met a Wells Fargo representative or employee, let alone that Wells Fargo had actual knowledge regarding Daboub's physical or mental condition.[6]  Accordingly, even if Daboub were incapacitated when she executed the Purchase Agreement and Assignment Form, Wells Fargo was entitled to rely on Daboub's authority under the POA under § 751.209.

---

[6] Cross-Plaintiffs argue that Wells Fargo "directly interacted with Vedah prior to the Purchase Agreement when it entered into the Assignment with Vedah" and "cannot deny actual knowledge of [Daboub's] capacity when it contracted with her directly."  ECF No. 71 at 16.  However, the Assignment Form reflects that Daboub signed the Assignment Form on October 16, 2020, and Wells Fargo representatives signed the document on October 20, 2020, the Purchase Agreement's effective date.  Assignment Form, at 4–5.  In addition, Wells Fargo did not "contract" with Daboub via the Assignment Form; the Assignment Form contains no consideration and imposes no mutual obligations between Daboub and Wells Fargo.  Instead, Wells Fargo representatives signed the Assignment Form under a heading entitled "Certification – New Owner(s)," to certify certain information as correct, including that the document lists the correct taxpayer identification number, the citizenship of the new owner, and whether the new owner is subject to certain reporting obligations.  *Id.* at 5.

Cross-Plaintiffs make several arguments in response.  First, they argue that § 751.209 applies only in limited circumstances—namely, if the power of attorney is void, invalid, or terminated, or if the agent exceeds its authority—none of which apply here.  According to Cross-Plaintiffs, Daboub's alleged lack of capacity does not void the POA or the authority conveyed thereunder, but rather voids the Purchase Agreement, Assignment Form, and all associated documents.  ECF No. 71 at 16.

However, the Court concludes that Wells Fargo was entitled—and, in fact, required—to rely on the POA regardless of whether Daboub lacked capacity when she executed the Purchase Agreement and Assignment Form.  If Daboub had capacity, she had the authority to effectuate the Policy's sale under the POA, and third parties such as Coventry First and Wells Fargo were required to accept that authority.  *See* Tex. Est. Code § 751.201.  If Daboub was, as she claims, incapacitated, her authority under the POA would have terminated.  *See* Tex. Est. Code. § 751.132(a)(2) ("An agent's authority under a durable power of attorney terminates when . . .the agent dies, **becomes incapacitated**, is no longer qualified, or resigns." (emphasis added)).  In that scenario, because Cross-Plaintiffs did not allege that Wells Fargo actually knew of the alleged incapacity or termination of Daboub's authority under the POA, it was entitled to rely on the POA as though it were valid, under § 751.209.

Next, Daboub argues that Coventry First knew of Daboub's incapacity because of its agent's direct interactions with Daboub, and that Coventry First's knowledge was imputed to Wells Fargo, rendering § 751.209 inapplicable.  Cross-Plaintiffs point to allegations in their proposed Second Amended Crossclaim, in which they allege that Coventry First and Wells Fargo conspired to take advantage of Daboub and cause her to transfer and sell the Policy for low value.  *See* ECF No. 52-1 ¶¶ 28, 61–64.  However, these proposed amendments are futile and do

not justify a different outcome.[7]  Cross-Plaintiffs provide no authority for imputing Coventry First's knowledge to Wells Fargo.  On the contrary, the Texas Estate Code specifies that for transactions conducted through employees—*i.e.*, for business entities such as Coventry First and Wells Fargo—"a person is not considered to have actual knowledge of a fact relating to a durable power of attorney, principal, or agent if the employee conducting the transaction or activity involving the power of attorney does not have actual knowledge of the fact."  Tex. Est. Code § 751.211.  Accordingly, Wells Fargo is not considered to have actual knowledge of any facts relating to Daboub's status as it related to the POA if a Wells Fargo employee did not have actual knowledge of those facts.  Here, where there are no allegations of *any* Wells Fargo employee directly involved in the transaction with Daboub, Wells Fargo did not have actual knowledge of facts relating to Daboub's status vis-à-vis the POA.  Put differently, any knowledge that Coventry First employees may have had regarding Daboub's mental or physical state cannot be imputed to Wells Fargo to establish actual knowledge under § 751.209.

Cross-Plaintiffs also point to Texas Business and Commerce Code § 8.115(2), which states that a securities intermediate that has transferred a financial asset pursuant to an entitlement order at the direction of its customer is not liable to a person having an adverse claim to the asset unless the securities intermediary "acted in collusion with the wrongdoer in violating the rights of the adverse claimant."  However, the absence of any allegations regarding Wells Fargo's knowledge renders this provision inapplicable; the comments to this section state that "[k]nowledge that the action of the customer is wrongful is a *necessary* but not sufficient condition of the collusion test."  Tex. Bus. & Com. Code § 8.115 cmt.5 (emphasis added).  That

---

[7] As discussed previously, the Court has already denied Cross-Plaintiffs leave to amend their First Amended Crossclaim for lack of good cause.

is because "[i]t is not the role of the record-keeper to police whether the transactions recorded are appropriate," and accordingly, securities intermediaries are generally insulated from liability except "in egregious cases . . . beyond the ordinary standards of the business and implementing and recording transactions, and reaches a level of affirmative misconduct in assisting the customer in the commission of a wrong." *Id.*

Accordingly, under § 8.115(2), to the extent Cross-Plaintiffs are arguing that Wells Fargo is liable in its role as securities intermediary for colluding in the alleged wrongdoing of its customer, Coventry First, Cross-Plaintiffs must show that Wells Fargo knew Coventry First was acting wrongfully in its dealings with Daboub. However, neither the First nor the proposed Second Amended Crossclaim plausibly allege that Wells Fargo knew Coventry First was acting wrongfully or that Wells Fargo's role in the transaction went beyond the ordinary standards of business in its role as a securities intermediary. As discussed, there are no allegations that Wells Fargo directly interacted with Daboub, prior to, during, or after the transaction. Nor are there any plausible facts alleged in support of Cross-Plaintiffs' theory in the proposed Second Amended Crossclaim that "Wells Fargo and Coventry First were part of a larger scheme of low-ball life settlement offers and purchases of life insurance policies for less than fair market value from seniors in need." ECF No. 52-1 ¶ 28. For example, there are no allegations that Wells Fargo was involved in Coventry First's marketing efforts, communications with Daboub, or pricing decisions. Nor do Cross-Plaintiffs allege or describe other instances where Wells Fargo and Coventry First allegedly made "low-ball" life settlement offers, or identify other "seniors in need" impacted by the alleged scheme.

Instead, Cross-Plaintiffs simply allege that the purported scheme "dates back to 2015, wherein Wells Fargo allegedly serves as an 'intermediary,' contracting around agency

relationships and protecting companies from liability for perpetrating life settlement abuse of seniors," citing sealed exhibits attached to Wells Fargo's Counterclaim, namely the Tripartite Entitlement Order, the MPP Agreement, and the bill of sale and entitlement order associated with Miravast's purchase of the Policy.[8] *See id.*  But nothing in the documents cited indicate that the arrangement between Wells Fargo and these other entities is anything other what is reflected on the face of the documents, namely that Wells Fargo held financial assets in securities accounts on behalf of entitlement holders, and credited or debited securities accounts with the Policy pursuant to instructions from those entitlement holders.  Put simply, Cross-Plaintiffs have failed to plausibly allege that Wells Fargo was acting as anything other than a securities intermediary for the various entitlement holders involved, pursuant to longstanding agreements that predate the transaction at issue in this lawsuit.  Accordingly, Cross-Plaintiffs have not plausibly alleged that Wells Fargo knew of or colluded with Coventry First in any alleged wrongdoing, and accordingly § 8.115(2) is inapplicable.

Finally, the Court notes that in addition to the foregoing, based on the undisputed evidence and Cross-Plaintiffs' allegations, Wells Fargo qualifies as a protected purchaser who acquired the Policy free of Cross-Plaintiffs' adverse claim; similarly, Miravast is a protected purchaser of the Policy's security entitlement.  A "[p]rotected purchaser" means a purchaser of a security, or interest therein, who gives value, does not have notice of any adverse claim, and obtains control of the security.  Tex. Bus. & Com. Code § 8.303(a).  If a purchaser qualifies as a "protected purchaser," it acquires its interest in the security free of any adverse claim.  *Id.* § 8.303(b).  Section 8.116 of the Texas Business and Commerce Code expressly provides that

---

[8] Cross-Plaintiffs' reference to 2015 appears to be based on a statement in the Tripartite Entitlement Order describing the "LST III Originator's Securities Account Control Agreement (Wells), dated as of June 11, 2015," between Coventry First and Wells Fargo, as securities intermediary for Coventry."  *See* Tripartite Entitlement Order at 1; Countercl. ¶ 71.

"[a] securities intermediary that receives a financial asset and establishes a security entitlement to the financial asset in favor of an entitlement holder is a purchaser for value of the financial asset."

Here, Wells Fargo received a financial asset, the Policy, and established a security entitlement to the Policy for an entitlement holder—first, in favor of LST III, and then Miravast—and accordingly, qualifies as a purchaser for value of the Policy. Because Cross-Plaintiffs do not plausibly allege that Wells Fargo had any notice of their adverse claim to the Policy at the time of the assignment, it qualifies as a "protected purchaser," and took ownership of the Policy free from Cross-Plaintiffs' adverse claim. Likewise, an adverse claim to a financial asset cannot be asserted against a person who acquires a security entitlement in the asset from a securities intermediary for value and without notice of the adverse claim. *Id.* §§ 8.501–.502. Here, Cross-Plaintiffs do not allege that Miravast had any knowledge of Daboub, let alone the adverse claim to the Policy, when it paid value for and acquired a security entitlement in the Policy.[9] Instead, Cross-Plaintiffs point again to Texas Business and Commerce Code § 8.115(2), to argue that Wells Fargo can still be liable if it acted "in collusion" with a wrongdoer in violating the adverse claimant's rights. However, as discussed, the Court has already concluded that § 8.115(2) does not apply because Cross-Plaintiffs do not plausibly allege that Wells Fargo acted in any capacity other than as securities intermediary in its dealings with Coventry First, LST III, and Miravast.[10]

---

[9] Indeed, neither the First nor the proposed Second Amended Crossclaim reference Miravast in any capacity. *See generally* First Am. Crosscl.; ECF No. 52-1.

[10] In their proposed Second Amended Crossclaim, Cross-Plaintiffs additionally seek a declaratory judgment on the grounds that because Coventry First allegedly failed to give notice to Daboub of the start of a recission period provided for in the Purchase Agreement, the Purchase Agreement should have been deemed automatically rescinded when Decedent died on November 11, 2020. *See* ECF No. 52-1 ¶ 35(v). However, even construing this allegation in the light most favorable to Cross-Plaintiffs, Coventry First's alleged failure to provide notice does not alter the Court's

For the foregoing reasons, Wells Fargo's Motion for Judgment on the Pleadings is **GRANTED** as to Count 1 in its Crossclaim against Daboub and Count 1 in its Counterclaim against Shermer, and Count 1 in Cross-Plaintiffs' First Amended Crossclaim. Based on the documents attached to the Interpleader Complaint, Cross-Plaintiffs' First Amended Crossclaim, and Wells Fargo's Crossclaim and Counterclaim—the validity of which Cross-Plaintiffs do not dispute—Wells Fargo is the owner and beneficiary of the Policy, and Miravast is the entitlement holder to the Policy, and both Wells Fargo and Miravast took their interest in the Policy free from Cross-Plaintiffs' adverse claim to the Policy or its proceeds. Under Texas Estates Code § 751.209, Wells Fargo was entitled to rely on the POA as though it were valid, regardless of Daboub's alleged incapacity.

### c. Indemnity Counterclaim

Wells Fargo next moves for judgment on the pleadings on its indemnity counterclaim against Shermer as Executor and Trustee of Decedent's estate and trusts, on the grounds that Cross-Plaintiffs' claim to the Policy's proceeds caused Brighthouse to file this action and deduct its fees and costs from the Policy proceeds that would otherwise be due to Wells Fargo.

There are five elements to a contractual indemnity claim under Texas law: (1) a contractual indemnity agreement exists, (2) the agreement obligates one party to indemnify the other for particular claims, (3) those claims were made, (4) all conditions precedent for recovery had occurred, been performed, waived, or excused, and (5) the party seeking relief has been damaged. *CompuCom Systems, Inc. v. WJ Global, LLC*, No. 3:14-CV-3625-L, 2017 WL 1190492, at *2 (N.D. Tex. Mar. 31, 2017) (citing *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 719 (5th Cir.

---

prior conclusion that Wells Fargo is the Policy's owner and beneficiary, and that Wells Fargo and Miravast are protected purchasers of the Policy.

1995)).  The "party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).  "When the terms of a contract are clear and unambiguous, and the facts concerning breach or performance are undisputed or conclusively established, the issue of whether the facts show performance or breach is also decided as a matter of law." *CompuCom*, 2017 WL 1190492, at *2.

Wells Fargo points to the POA, which states Decedent's agreement that "any third party who receives a copy of [the POA] may act under it," and requires Decedent "to indemnify the third party for any claims that arise against the third party because of reliance on this power of attorney." POA at 6–7.  Wells Fargo posits that it and Miravast relied on the POA in good faith, and Cross-Plaintiffs made claims against Wells Fargo because of its reliance on the POA.  *See* First Am. Crosscl.; Shermer Ans. to Countercl. (ECF No. 57) ¶ 64 ("Danielle [Shermer] admits she has made a claim against the Policy . . . .").

Based on the clear language of the POA, Decedent agreed to indemnify a third party for "any" claims made against the third party "because of reliance on" the POA.  As discussed, Wells Fargo relied on the POA—specifically, Daboub's authority to act on Decedent's behalf in executing the Purchase Agreement and Assignment Form—in good faith in crediting various entitlement holders with the Policy.  Cross-Plaintiffs' claims against Wells Fargo are based on its reliance on the POA and Daboub's associated authority under it; put differently, the validity of the Purchase Agreement, Assignment Form, and all subsequent transactions involving the Policy are all premised on Daboub's authority to execute documents on Decedent's behalf under the POA. Indeed, Wells Fargo alleges that before LST III sold the Policy to Miravast, LST III provided Miravast with a redacted copy of the Purchase Agreement and the POA to establish LST III's

ownership of the Policy.  Countercl. ¶¶ 80, 143.  Besides Wells Fargo's reliance on the POA—and the subsequent claims brought against Wells Fargo based on that reliance—there appear to be no other conditions precedent to application of the POA's indemnification provision.  Moreover, Wells Fargo has been damaged, both by its own fees incurred and by the deduction of Brighthouse's costs and fees from the Policy's proceeds.  Accordingly, the Court concludes as a matter of law that, based on the undisputed facts and the POA's unambiguous terms, Decedent's performance is required as a matter of law and Wells Fargo is entitled to indemnification.

Cross-Plaintiffs respond that Wells Fargo's Motion for Judgment on the Pleadings as to the indemnification claim should be denied because the claim is not yet ripe, and even if it were, jurisdiction to adjudicate the claim lies solely with the Dallas County Probate Court.  These arguments fail.  Cross-Plaintiffs do not explain why the claim is not ripe, but to the extent they contend that Wells Fargo's costs and fees are not yet known, that argument fails; there is nothing precluding the Court from determining Wells Fargo's right to indemnification under the clear and ambiguous terms of the POA. The specifics relating to the amount owed will be determined at a later date.

Moreover, the Court concludes that the probate exception to federal jurisdiction does not prevent the Court from granting judgment to Wells Fargo on its indemnification claim.  The probate exception is a longstanding limitation on federal jurisdiction, described by the Supreme Court as follows:

> The probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. **But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction**.

*Marshall v. Marshall*, 547 U.S. 293, 311–12 (2006) (emphasis added).

Thus, while a federal court has no jurisdiction to probate a will or administer an estate, it has jurisdiction to hear suits in favor of creditors, legatees, heirs, and other claimants against a decedent's estate to establish their claims, "so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." *Markham v. Allen*, 326 U.S. 490, 494 (1946).  Interpreting *Markham*, the Fifth Circuit has explained that "a creditor may obtain a federal judgment that he has a valid claim against the estate for one thousand dollars," but the federal court may not "order payment of the creditor's thousand dollars, because that would be an assumption of control over property under probate." *Turton v. Turton*, 644 F.2d 344, 347 (5th Cir. 1981).  "Instead, the federal court is limited to declaring the validity of the asserted claims, leaving the claimants to assert their federal judgments as res judicata in the probate court." *Id.*

Accordingly, Wells Fargo's Motion for Judgment on the Pleadings on its indemnification claim is **GRANTED** as follows: Wells Fargo, as securities intermediary, has a valid indemnification claim against Decedent's estate for the damages it incurred as a result of Cross-Plaintiffs' claim to the Policy and the claims asserted against Wells Fargo based on its reliance on the POA, including Wells Fargo's costs and fees incurred in defending Cross-Plaintiffs' claims in this lawsuit, as well as the $7,481.00 in fees and costs awarded by this Court to Brighthouse for pursuing this interpleader action.

### d.  Cross-Plaintiffs' Remaining Claims

Wells Fargo moves for judgment on the pleadings against all of Cross-Plaintiffs' remaining claims, namely undue influence, fraud, violations of the Texas Deceptive Trade Practices Act ("DTPA"), violations of the Texas Life Settlement Act/negligence per se, and attorneys' fees.[11]

---

[11] The Court notes that, under Texas Business and Commerce Code § 8.115, as a securities intermediary that has transferred a financial asset pursuant to an effective entitlement order at the direction of its customer, Wells Fargo is

Coventry First likewise moves to dismiss Cross-Plaintiffs' claims asserted against it in the First Amended Crossclaim, apart from Cross-Plaintiffs' claim for declaratory judgment.  Accordingly, given that the standard for analyzing Wells Fargo's Motion under Rule 12(c) is the same as Coventry First's under Rule 12(b)(6), the Court will consider each defendant's arguments as to Cross-Plaintiffs' claims together.

### i.   **Undue Influence**

Count 2 of the First Amended Crossclaim alleges that Coventry First exerted undue influence over Daboub when she lacked capacity, resulting in Daboub executing the Purchase Agreement and Assignment Form when she would not have otherwise.  First Am. Crosscl. ¶¶ 35–40.  Accordingly, Cross-Plaintiffs allege that the sale, transfer, conveyance, and assignment of the Policy is invalid, the Policy's proceeds should be paid to Cross-Plaintiffs, and Cross-Plaintiffs are entitled to damages from Coventry First and Wells Fargo.  *Id.*

The Texas Supreme Court has recognized that "[u]ndue influence itself is not an actionable tort."  *Kinsel v. Lindsey*, 526 S.W.3d 411, 422 n.3 (Tex. 2017).  "[C]onsequently, damages are not recoverable based solely on an undue-influence finding," and instead, a finding of undue influence is grounds for setting aside or rescinding an otherwise binding agreement.  *Id.* To that end, Courts have construed claims of "undue influence" as a possible basis for rescission as part of a breach of contract claim.  *E.g.*, *Mainor v. Deutsche Bank Tr. Co. Americas*, No. CIV.A. H-13-3464, 2014 WL 51325, at *1 (S.D. Tex. Jan. 7, 2014) ("[T]he Court construes Plaintiffs' 'undue influence' claim as part of their breach of contract claim.").

---

not liable to any person having an adverse claim to the Policy except under specific circumstances not applicable here. *See supra* (discussing inapplicability of § 8.115(2)).  The Court's discussion of Cross-Plaintiffs' remaining claims provides additional justification for granting judgment on the pleadings to Wells Fargo.

Under Texas law, Cross-Plaintiffs' claim for damages based on undue influence is not actionable. In addition, because Coventry First has subsequently sold the Policy and it is impossible to restore the parties to their former positions, rescission or cancellation of the Purchase Agreement and Assignment Form is not available. *See Gentry v. Squires Const., Inc.*, 188 S.W.3d 396, 410 (Tex. App.—Dallas 2006, no pet.) ("[A]n inability to return the parties to their former position should be considered in determining whether rescission would be inequitable."). As discussed, Wells Fargo is the owner and beneficiary of the Policy, and as protected purchasers, both Wells Fargo and Miravast obtained their interests free from adverse claims to the Policy.

Accordingly, because Cross-Plaintiffs' claim for undue influence is not actionable, the Court **GRANTS** Wells Fargo's Motion for Judgment on the Pleadings and Coventry First's Motion to Dismiss on these grounds.

### ii.  Fraud

Count 3 of the First Amended Crossclaim alleges that Coventry First and Wells Fargo intentionally made numerous material false representations to Daboub, which she reasonably relied on to her detriment. Specifically, Cross-Plaintiffs allege that Coventry First represented that Daboub "had the legal authority to sell, transfer, convey, or assign the Policy," that "the sale of the Policy was in the best interest" of Decedent and Daboub, and made false representations regarding "the nature of Coventry First and Wells Fargo's deep-seeded business relationship of engaging in similar life insurance assignments for less than fair market value to defraud the elderly." First Am. Crosscl. ¶¶ 41–44.

In alleging fraud, to satisfy Rule 9(b), Cross-Plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *See Flaherty*, 565 F.3d at 207.

Here, as discussed previously, Cross-Plaintiffs do not allege that Daboub ever met or directly interacted with a Wells Fargo employee or representative, or that Wells Fargo specifically made *any* statements to Daboub, let alone false or misleading representations.[12] *See generally* First Am. Crosscl. Accordingly, Wells Fargo's Motion for Judgment on the Pleadings as to Cross-Plaintiffs' fraud claim is **GRANTED**.

As to Coventry First, Cross-Plaintiffs point to allegations in the First Amended Crossclaim which, they contend, satisfy the requirements of Rule 9(b), including that: while isolated, Daboub saw an advertisement from Coventry First targeting the elderly in financial despair; from the advertisement, Daboub understood that Coventry First wanted to help her, as opposed to profit from her situation; over the course of several months, a Coventry First agent, "Allison," gained Daboub's trust; Daboub believed Allison was her friend; Coventry First offered to buy the Policy for $74,800; Allison continued to contact and pressure Daboub to sell the Policy, "despite knowing [Daboub's] weakened state of mind"; that Allison sent flowers to Daboub and apologized "for what had happened" after the sale; and that on the last day of the

---

[12] Cross-Plaintiffs' proposed Second Amended Crossclaim attempts to bolster its fraud claim against Wells Fargo by listing two "material false" representations allegedly made by Wells Fargo to Daboub, namely "Wells Fargo's representations regarding involvement in the life settlement" and "Wells Fargo's representations regarding its relationship with Coventry First." ECF No. 52-1 ¶ 46(j)–(k). However, these proposed amendments fail to pass muster under Rule 9(b), given that Cross-Plaintiffs remain unable to identify a single Wells Fargo employee or representative who ever affirmatively communicated with or made representations directly to Daboub. At most, Daboub appears to be alleging that Wells Fargo failed to disclose its involvement in the life settlement or relationship with Coventry First, but fraud by nondisclosure requires an associated duty to disclose, which is not alleged here. *See Tornado BUS Co. v. BUS & Coach Am. Corp.*, No. 3:14-cv-3231-M, 2015 WL 11120584, at *5 (N.D. Tex. Dec. 15, 2015) ("If there is no duty to disclose, there is no fraud by nondisclosure."). Accordingly, Cross-Plaintiffs' proposed amendments as to its fraud claim against Wells Fargo are futile.

Purchase Agreement's recission period, Coventry First notified Shermer of Daboub's sale of the Policy. *See* ECF No. 53 at 14.

These allegations do not satisfy Rule 9(b)'s specificity requirements for pleading fraud. On the whole, these allegations do not recount affirmative misrepresentations by Coventry First, but rather factual events and Daboub's associated beliefs about those events. For instance, allegations that Allison, a Coventry First representative, contacted Daboub over several months and that Daboub believed they were friends does not describe actionable fraud; it is merely a description of events that occurred and Daboub's opinion about those events. Of the allegations that could plausibly be construed as affirmative representations by Coventry First—namely, the advertisement seen by Daboub and Coventry First's notification to Shermer of the sale—Cross-Plaintiffs do not explain how these statements were false or fraudulent when made.

Cross-Plaintiffs also point to general allegations in the First Amended Crossclaim that Coventry First misrepresented that Daboub "had the legal authority to sell, transfer, convey, or assign the Policy" and that "the sale of the Policy was in the best interest" of Decedent and Daboub, and misrepresented Coventry First and Wells Fargo's relationship. These alleged representations likewise do not constitute fraud or satisfy Rule 9(b). None of these allegations recite the statement made, specify a speaker, or describe when or where the statement was made. Nor does the First Amended Crossclaim explain how these statements are fraudulent or amount to more than mere opinion, which will not support an action for fraud. For instance, Texas law provides that representations about the legal effect of a document—for instance, whether Daboub had authority under the POA to sell the Policy—is generally considered to be a statement of opinion. *See Fina Supply, Inc. v. Abilene Nat. Bank*, 726 S.W.2d 537, 540 (Tex. 1987) ("A representation as to the legal effect of a document is regarded as a statement of opinion rather

than of fact and will not ordinarily support an action for fraud."). Similarly, statements about value or future events constitute opinion, not actionable misrepresentation, although an opinion about value may be actionable if the defendant has superior knowledge to that of the plaintiff. *See, e.g.*, *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 277 (Tex. 1995) ("The value of such an unliquidated claim is inherently a matter of opinion."). Here, whether the sale of the Policy was "in the best interest" of Daboub and Decedent is inherently subjective, and Cross-Plaintiffs do not allege Coventry First had superior knowledge in that regard; indeed, such allegations would be purely speculative. Moreover, Daboub unquestionably had better knowledge of her own finances and personal affairs than did Coventry First, and therefore would be in a better position to know whether selling the Policy would ultimately be in Daboub's "best interests."

For the foregoing reasons, Coventry First's Motion to Dismiss as to Cross-Plaintiffs' fraud claim is **GRANTED**.[13]

### iii. Texas DTPA

Claim 4 of the First Amended Crossclaim alleges that Coventry First and Wells Fargo violated the Texas DTPA by engaging in false, misleading, or deceptive trade practices. First Am. Crosscl. ¶¶ 45–48. To prevail under the DTPA, a plaintiff must establish the following elements: "(1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the consumer's damages." *In re Frazin*, 732 F.3d 313, 323 (5th Cir. 2013) (quoting *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir. 2002)). There are two requirements to qualify as a "consumer" under the DTPA: "First, the person must seek or acquire goods or services by purchase or lease.

---

[13] The Court has considered Cross-Plaintiffs' proposed amendments in the Second Amended Crossclaim, and likewise concludes that the allegations in support of Cross-Plaintiffs' fraud claim fail to satisfy the specificity requirements of Rule 9(b).

Second, the goods or services purchased or leased must form the basis of the complaint.**"** *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 725 (5th Cir. 2013). The DTPA defines "goods" as "tangible chattels or real property purchased or leased for use." Tex. Bus. & Com. Code ¶ 17.45(1). "Services" are "work, labor, or service purchase or leased for use, including services furnished in connection with the sale or repair of goods." *Id.* § 17.45(2).

Daboub does not qualify as a consumer under the DTPA; she did not acquire goods or services by way of purchase or lease. On the contrary, she sold a financial asset and received money in return. *See Miller*, 726 F.3d at 725 ("[M]oney is considered to be neither a good nor a service." (quoting *Ford v. City State Bank of Palacios*, 44 S.W.3d 121, 133 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.))). In addition, for the reasons discussed in connection with Cross-Plaintiffs' fraud claim, Cross-Plaintiffs do not adequately allege that Coventry First or Wells Fargo engaged in fraudulent or misleading conduct to satisfy Rule 9(b)'s more stringent pleading requirements. *See, e.g.*, *Shakeri v. ADT Sec. Servs., Inc*., No. 3:13-CV-2852-D, 2014 WL 5780955, at *3 (N.D. Tex. Nov. 6, 2014) (applying Rule 9(b) to fraud-based DTPA claims), *aff'd on other grounds*, 816 F.3d 283 (5th Cir. 2016).

Accordingly, because Daboub does not qualify as a "consumer" under the DTPA, the Court **GRANTS** Wells Fargo's Motion for Judgment on the Pleadings and Coventry First's Motion to Dismiss on these grounds.

### iv.   Life Settlements Act / Negligence Per Se

Claim 5 of the First Amended Crossclaim alleges that Coventry First and Wells Fargo violated the Texas Life Settlements Act by engaging in fraudulent life settlement acts, prohibited practices, and failing to provide disclosures required under §§ 1111A.012, .014, and .017 of the

Texas Insurance Code.  First Am. Crosscl. ¶¶ 49–55.  Cross-Plaintiffs further allege that

Coventry First and Wells Fargo's acts constitute negligence per se.

Coventry First and Wells Fargo both argue that the Life Settlements Act does not provide

a private right of action.  Under Texas law, a statute creates a private cause of action "only when

a legislative intent to do so appears in the statute as written."  *Brown v. De La Cruz*, 156 S.W.3d

560, 567 (Tex. 2004); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ("If the statute

does not itself so provide, a private cause of action will not be created through judicial

mandate.").

The Texas Life Settlements Act does not contain a private right of action.  *See* Tex. Ins.

Code §§ 1111a.001–.026.  At most, the statute provides that the Texas Insurance Commissioner

may seek civil remedies of injunctions or cease and desist orders to address violations of the Act.

*Id.* § 1111a.023.  The Court notes that other portions of the Texas Insurance Code expressly

grant a private right of action for enforcement.  *Compare id.*, *with* Tex. Ins. Code § 541.151 ("A

person who sustains actual damages may bring an action against another person for those

damages . . . .").  Accordingly, the Court must give effect to the Texas Legislature's omission of

a private right of action from the Texas Life Settlements Act.  *See Brown*, 156 S.W.3d at 568

("[W]hen the Legislature includes a right or remedy in one part of a code and omits it in another,

that may be precisely what the Legislature intended.").

Seemingly recognizing that there is no statutory avenue for relief under the Life

Settlements Act, Cross-Plaintiffs bring, in the alternative, a claim for negligence per se based on

violations of the LSA.  "Negligence per se is a common-law doctrine in which a duty is imposed

based on a standard of conduct created by a penal statute rather than on the reasonably prudent

person test used in pure negligence claims."  *Silva v. Wells Fargo Bank, N.A.*, No. 1:12-CV-180,

2014 WL 12586396, at *6 (S.D. Tex. Mar. 17, 2014) (quoting *Smith v. Merritt*, 940 S.W.2d 602

(Tex. 1997)); *see also Perry v. S.N.*, 973 S.W.2d 301, 308 (Tex. 1998) ("[T]he defendant in most

negligence per se cases already owes the plaintiff a pre-existing common law duty to act as a

reasonably prudent person, so that the statute's role is merely to define more precisely what

conduct breaches that duty.").  To prevail on a negligence per se claim, Daboub must prove that

(1) she belongs to the class that the statute was intended to protect and the injury that occurred is

the type of injury the statute was meant to prevent, (2) it is appropriate to impose tort liability for

violations of the statute, and (3) the violation of the statute was the actual and proximate cause of

her injuries.  *Silva*, 2014 WL 12586396, at *6 (citing *Discovery Operating, Inc. v. BP Am. Prod.

Co*., 311 S.W.3d 140, 162–63 (Tex. App.—Eastland 2010, pet. denied)).

      Cross-Plaintiffs argue that the Life Settlements Act specifically provides for criminal

liability and civil remedies through the Texas Insurance Commissioner, thus "leaving open the

opportunity to impose other civil liability, including negligence per se."  ECF No. 62 at 25

(citing Tex. Ins. Code §§ 1111a.023–.024).  However, the fact that the Texas Legislature enacts a

criminal statute does not necessarily mean that a court should recognize a civil cause of action

predicated upon that statute.  *Reeder v. Daniel*, 61 S.W.3d 359, 362 (Tex. 2001).  Instead, in

determining whether a penal statute provides the basis for a civil cause of action, the Court "must

consider whether recognizing such an accompanying civil action would be inconsistent with

legislative intent."  *Id.*  In analyzing whether negligence per se should apply, the Texas Supreme

Court has acknowledged that "recognizing a new, purely statutory duty 'can have an extreme

effect upon the common law of negligence' when it allows a cause of action where the common

law would not."  *Perry*, 973 S.W.2d at 306.

The Court notes that Cross-Plaintiffs identify no cases from Texas courts recognizing a viable negligence per se claim premised on §§ 1111a.002(7) ("Definitions: 'Fraudulent life settlement act'"), .012 ("Disclosure to Owners"), .014 ("General Rules") or .017 ("Prohibited Practices"), the provisions of the Life Settlements Act allegedly violated by Coventry First and Wells Fargo. *See* ECF Nos 53, 71. Nor do Cross-Plaintiffs identify a preexisting common law duty owed by Coventry First or Wells Fargo to Cross-Plaintiffs, for which only the standard of conduct will be borrowed from the Life Settlements Act. *See Perry*, 973 S.W.2d at 307 ("[T]he absence of a relevant common law duty should be considered in deciding whether to apply negligence per se to the Family Code's reporting provision."). On the contrary, Cross-Plaintiffs' arguments indicate the opposite, namely that the Life Settlements Act is part of a highly regulated statutory scheme, detailing, *inter alia*, licensing, contract, disclosure, and advertisement requirements. *E.g.*, ECF No. 53 at 23–24 ("[T]he statute's strict standards for the solicitation of life settlement contracts and rigorous disclosure requirements are designed to protect lay people, ignorant of the ins and outs of insurance, from sophisticated fraud . . . .").

Accordingly, in light of the Texas Legislature's decision to not include a private right of action in the Texas Life Settlements Act, as well as the absence of any applicable preexisting common law duty, the Court declines to create a new cause of action based on a theory of negligence per se, particularly where the Texas Supreme Court has recognized that doing so could have "an extreme effect" on the common law of negligence. *Perry*, 973 S.W.2d at 306; *cf. id.* at 306–07 ("[T]his Court in fact has created a new duty by applying negligence per se on only one occasion."); *Trevino v. Ortega*, 969 S.W.2d 950, 951 (Tex. 1998) ("This Court treads cautiously when deciding whether to recognize a new tort."). The Court **GRANTS** Wells

Fargo's Motion for Judgment on the Pleadings and Coventry First's Motion to Dismiss on these grounds.

### v. Attorneys' Fees

Cross-Plaintiffs make a claim for attorneys' fees. Under Texas law, attorneys' fees may not be recovered unless provided for by statute or by contract between the parties. *Dall. Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992). Cross-Plaintiffs point only to the DTPA as providing a statutory basis for costs and fees. *See* ECF No. 71 at 35 (Tex. Bus. & Com. Code § 17.50(d)). As the Court has already determined that Cross-Plaintiffs are not entitled to recover under the DTPA, Cross-Plaintiffs' claim for attorneys' fees is likewise unsuccessful.

## IV.   CONCLUSION

For the foregoing reasons, Cross-Plaintiffs' Motion for Leave to Amend is **DENIED.** Wells Fargo's Motion for Judgment on the Pleadings is **GRANTED**. However, the Court notes that Wells Fargo did not move for judgment on its intentional and negligent misrepresentation crossclaims and counterclaims. *See* Wells Fargo Crosscl. ¶¶ 81–94; Countercl. ¶¶ 165–78. Accordingly, by **January 10, 2022**, Wells Fargo shall either dismiss those claims or inform the Court of its intent to proceed on them. Judgment will be entered separately.

Coventry First's Motion to Dismiss is **GRANTED**. The Court notes that Coventry First did not move to dismiss Cross-Plaintiffs' declaratory judgment claim against it; however, Cross-Plaintiff's declaratory judgment claim is resolved by the Court's decision on Wells Fargo's Motion for Judgment on the Pleadings. In addition, the Court has considered Cross-Plaintiffs' proposed amendments to the First Amended Crossclaim, and concluded that such amendments

would not cure the pleading deficiencies.  Accordingly, Cross-Plaintiffs' claims against Coventry First are all **DISMISSED WITH PREJUDICE**.

      **SO ORDERED**.

December 30, 2021.

BARBARA M. G. LYNN
CHIEF JUDGE